UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIM JAMIL et al.,

    Plaintiffs,

v.

KEVIN LONGE et al.,

    Defendants.

Case No. 24-13029
Honorable Laurie J. Michelson

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO STAY AND DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO DISMISS [15]**

Spray Foam Genie International, LLC, a Michigan-based company, claims to be the "leading spray foam insulat[ion] contractor" and has franchises across the country. (ECF No. 1, PageID.5.) They advertise flexible franchise models, including the "Franchisee Investor" model, where franchise owners can operate as investors rather than as managers, working only part time at the franchise and keeping their existing jobs. Tim and Lisa Jamil and their company TL Jamil LLC (collectively "the Jamils") were interested in this model and contracted with SFGI and their franchise management services company, Spray Foam Genie Managed Services, to open franchises in Florida and Washington D.C. But as it turns out, the hands-off investor model was too good to be true: despite SFGI's assurances to the contrary, the Jamils spent 40–50 hours per week managing the Florida franchise (while paying SFGI and SFGM for management services) and more than $1.3M on the franchises (despite

SFGI's advertisement that investments typically range from $100,000 to $650,000). As a result, the D.C. franchise never opened.

Bound by an arbitration agreement in the franchise contract, the Jamils initiated arbitration proceedings against SFGI, along with several of its officers, its parent- and owner-companies, and officers of those companies. The arbitration against SFGI is ongoing, but the related officers and entities were not parties to the arbitration agreement and consequently were dismissed from the arbitration. So the Jamils filed this separate lawsuit against them. All but one of the Defendants moved to dismiss various claims against them and/or to stay the case pending the resolution of the arbitration against SFGI. For efficiency purposes and to preserve resources, the Court opts for the latter route, staying the case without deciding the motion to dismiss. Accordingly, Defendants' request to stay this case is granted, but their motion to dismiss is denied without prejudice.

## I.

SFGI, while not a party to this case, is at the heart of the dispute here. SFGI is the franchisor of Spray Foam Genie franchises, which provide spray foam insulation services across the U.S. (*Id.*) SFGI is owned and operated by its officers Kevin Longe, Chris Ryan, Keith Ryan, and Gregory Longe. (*Id.* at PageID.6.) SFGI is also partially owned by Rhino7 Consulting Company and Phoenix Franchise Consulting LLC—which in turn is operated by Gregory and Maria Longe. (*Id.*) And SFGI's parent company is Long Acquisitions, LLC. (*Id.*) All of these parties, except for SFGI, are named as Defendants in this suit. In addition, Shelly Chavez and

Steven and Riley McEntire (who are named as franchise sellers in Spray Foam Genie's Franchise Disclosure Document) and SFGM (a company that Spray Foam Genie franchisees are required to contract with for franchise management services) are also named as Defendants in this case. (*Id.* at PageID.7.)

SFGI advertises a "Franchisee Investor" model. According to SFGI, it works like this: franchisees provide the up-front capital needed to open a Spray Foam Genie franchise, but SFGI takes care of setting up, managing, and overseeing the franchise business. (*Id.* at PageID.8.) Franchisee investors get to be "Semi-Absentee," meaning that they can work at the franchise part-time and can keep their previous jobs. (*Id.*) For its part, SFGI promises to provide "very detailed" training, online tools, technical support, operational systems support (including payroll, HR, employee benefits, insurance, regulatory compliance, safety manuals, employee handbooks, policies, and protocols), and call center agents that sell products and schedule appointments with customers. (*Id.* at PageID.8–9.)

The Jamils were interested in this investment opportunity and began discussions with SFGI and its officers about opening their own Spray Foam Genie franchise. They met with Kevin Longe and Chris Ryan several times over Zoom to discuss details. (*Id.* at PageID.11.) The Jamils say they were advised that Spray Foam Genie franchises were "affordable" and easy to open, given SFGI's extensive support services. (*Id.* at PageID.7.) They were allegedly told they "would not have to manage the Franchises, but that they would only have to provide the initial capital for the Franchises" and "meet once a month to go over financials." (*Id.* at PageID.16.) They

3

were also provided a Franchise Disclosure Document which represented the initial investment for opening a Spray Foam Genie franchise as being $243,200 to $299,200. (*Id.* at PageID.22.) And Kevin and Chris promised them "they would be millionaires." (*Id.* at PageID.11.)

Encouraged by these discussions, the Jamils moved forward with the franchise process. On March 27, 2023, the Jamils contracted with SFGI and SFGM to open a Spray Foam Genie franchise in Florida. (*Id.* at PageID.11, 16.) And just a month later, on April 29, 2023, they contracted to open a second franchise in Washington D.C. (*Id.* at PageID.12.) The Jamils paid an initial franchise fee of $450,000 for these two franchises and monthly fees of $2,000 for "access to and use of certain technology, including the Sales & Marketing Center, support from the franchisor, and access to the local marketing library." (*Id.*)

The Jamils then started opening the Florida franchise. (*Id.* at PageID.11.) But they encountered numerous problems along the way.

Despite the $2,000 monthly use fee they paid for management services, the Jamils say SFGI "did not provide the technology, support, or marketing that [it] represented it would provide." (*Id.* at PageID.12.) The Jamils allege that they did not receive adequate training, which led them to lose customers. (*Id.* at PageID.14.) They also did not receive the operations manual until seven months after their opening, and when they did, it did not provide "meaningful information about how to operate" the franchise. (*Id.* at PageID.15.) The Jamils say they worked 40–50 hours per week on the franchise, despite "paying Defendants to manage most of the business." (*Id.* at

4

PageID.16.) And SFGM allegedly failed to perform many of their responsibilities under the Management Agreement, including acquiring a location for the franchise, purchasing a vehicle for the franchise, purchasing the necessary fixtures and equipment, providing supplies or supply lists, developing a business plan, managing the office, interviewing and hiring employees or providing guidance on how to hire qualified employees, providing human resource services, billing customers for services, bookkeeping, advertising, and facilitating fund transfers. (*Id.* at PageID.17–20.) As the Jamils put it, "SFGM took its significant fees and left Plaintiffs to fend for themselves." (*Id.* at PageID.18.)

Likewise, the Jamils say they did not receive accurate information regarding the costs of opening a Spray Foam Genie franchise. The Jamils were told that Rhino7 would finance spray foam trailers for the franchise and that the initial cost of a trailer rig was $20,000 to $35,000; instead, the trailers cost $196,000 and Rhino7 refused to provide any financing, which delayed opening of the franchise by three months. (*Id.* at PageID.22–23.) Defendants also claimed that insurance would cost between $8,000 and $10,000; it actually cost $40,000 per year. (*Id.* at PageID.23.) Likewise, the labor cost was estimated to be between approximately $84,000 and $220,000, but this calculation did not include the salespersons' salaries; when the Jamils confronted the Defendants about this discrepancy, they were told to "not pay employees for travel time to a jobsite and to not pay overtime for spray technicians." (*Id.* at PageID.24.) The Jamils spent over a million dollars to get the Florida franchise operational, well above the $243,200 to $299,200 they were told it would take. (*Id.* at PageID.23.)

The Jamils say that Defendants, collectively, "exploit the contract that SFG has with its franchisees and obtain direct benefits from those contracts." (*Id.* at PageID.7.) They bring claims of fraud and embezzlement/conversion against all of the Defendants (*id.* at PageID.35–40) and a breach of contract claim against SFGM (*id.* at PageID.32–33). They also allege that Rhino7, Phoenix, Kevin, Chris, Keith, Gregory, Maria, Shelly, Steven, and Riley violated the Michigan Franchise Investment Law. (*Id.* at PageID.33–35.)

Kevin, Chris, Keith, Shelly, Steven, and Riley (collectively the "non-resident Defendants") moved to dismiss all claims against them for lack of personal jurisdiction because they do not reside in Michigan and argue they do not have sufficient minimum contacts with the state. (ECF No. 15, PageID.487.) The non-resident Defendants, along with Gregory, Maria, Longe Acquisitions, SFGM, and Phoenix, (all together the "moving Defendants") also moved to dismiss the MFIL, conversion/embezzlement, and fraud/misrepresentation claims against them under Federal Rule of Civil Procedure 12(b)(6). (*Id.*) The moving Defendants ask the Court to then stay the remaining claims pending the outcome of the arbitration against SFGI. (*Id.* at PageID.506.) The Jamils oppose the motion. (ECF No. 19.)

The motion is fully briefed and does not require oral argument. *See* E.D. Mich. LR 7.1(f). For the reasons set forth below, the Court will exercise its discretion to stay the case and will deny the motion to dismiss without prejudice to refiling, if warranted, after the completion of the SFGI arbitration.

## II.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants." *Ohio Env't. Council v. U.S. Dist. Court, S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936)). Courts generally have "broad discretion" to stay proceedings but must take into account the nonmoving party's "interest in bringing the case to trial." *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997); *see also Ohio Env't. Council*, 565 F.2d at 396 ("[Courts must] tread carefully in granting a stay of proceedings, since a party has a right to a determination of its rights and liabilities without undue delay.").

There is an added consideration when a case contains non-arbitrable and arbitrable claims (or in this case, non-arbitrable claims related to a pending arbitration). On one hand, the Federal Arbitration Act allows piecemeal litigation to occur concurrently with arbitration where only some of the relevant issues are arbitrable. *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985). On the other, the Supreme Court has also determined that "[i]n some cases . . . it may be advisable to stay litigation among the nonarbitrating parties pending the outcome of the arbitration. That decision is one left to the district court . . . as a matter of its discretion to control its docket." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983). Heeding that advice, several courts within the Sixth Circuit have exercised their discretion to stay the litigation of nonarbitrable claims

7

pending the outcome of an arbitration. *See, e.g.*, *Patnik v. Citicorp Bank Trust FSB*, 412 F. Supp. 2d 753 (N.D. Ohio 2005); *Lagrasso v. Prudential Ins. Co. of Am.*, 2018 U.S. Dist. LEXIS 115999, at 4–6 (E.D. Mich. July 12, 2018); *Gordon v. Royal Palm Real Estate Inv. Fund I, LLP*, No. 09-11770, 2011 U.S. Dist. LEXIS 22911, at *23–25 (E.D. Mich. Mar. 8, 2011); *Thomas v. Right Choice Staffing Grp., LLC,* No. 15-10055, 2015 WL 4078173, at *8 (E.D. Mich. July 6, 2015) (collecting cases). This route especially makes sense when the non-arbitrable claims "depend[] upon the same facts and [are] inherently inseparable from the arbitrable claims," *Thomas*, 2015 WL 4078173, at *8 (quoting *Patnik*, 412 F.Supp.2d at762) or "where the arbitration may resolve issues in the lawsuit," *id.* (citing *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir.1991)).[1]

Here, these considerations support staying the case pending the Jamil's arbitration with SFGI.

First, the arbitration proceedings are inextricably intertwined with the claims brought here. As the moving Defendants point out, the arbitration demand is nearly identical to this complaint. (ECF No. 15, PageID.507; *compare* ECF No. 1 *with* ECF No. 15-3.) It contains claims against SFGI for breach of contract, violations of the MFIL, conversion/embezzlement, and fraud/misrepresentation based on the same set

---

[1] Courts also have stayed claims to "promote the federal policy in favor of arbitration," *Thomas*, 2015 WL 4078173, at *8 (citing *AgGrow Oils, LLC v. Nat'l Union Fire Ins. Co.*, 242 F.3d 777, 782 (8th Cir. 2001)), but the Supreme Court has clarified that the federal policy "favoring" arbitration is not designed to foster arbitration, but rather to "place [arbitration] agreements upon the same footing as other contracts," *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418, (2022) (quoting *Granite Rock Co. v. Teamsters*, 561 U.S. 287, 302 (2010)).

of facts alleged here. (ECF No. 15-3.) And the Defendants here are sued primarily because of their connections with and work for SFGI.

Take, for example, the Jamils' MFIL claims. The MFIL allows joint and several liability against partners, executive officers, directors, and employees of a company that aid the company in violating the MFIL. Mich. Comp. Laws § 445.1532. But only if the company itself is also liable under the MFIL. *Id.*; *see also Tankersley v. Lynch*, No. 11-12847, 2012 WL 683384, at *5 (E.D. Mich. Mar. 2, 2012) (listing, as elements of an MFIL claim against individuals, that the company the individuals controlled must have violated the MFIL and be liable to the plaintiffs for that violation). So SFGI's liability under the MFIL, which the arbitration proceedings will almost certainly resolve, is a necessary precondition to the Defendants' MFIL liability in this suit. This claim fits squarely within the realm of cases that justify a discretionary stay: the nonarbitrable claims "depend[] upon the same facts and [are] inherently inseparable from the arbitrable claims," *Thomas*, 2015 WL 4078173, at *8 (quoting *Patnik*, 412 F.Supp.2d at 762), and "the arbitration may resolve issues in the lawsuit," *id.* (citing *Sierra*, 937 F.2d at 750).

The Jamils argue that dismissing or staying these individual MFIL claims would create a new rule requiring MFIL plaintiffs to proceed in two separate suits— "one to establish the liability of the company and a second for liability against the individuals who materially aid[] in the transaction constituting the violation." (ECF No. 19, PageID.917 (internal quotation marks omitted).) Not so. Indeed, absent the arbitration agreement between the Jamils and SFGI here, the claims against SFGI

9

and its officers could proceed in the same litigation. In fact, the two different claims were proceeding in the same arbitration before the Defendants were dismissed from it. The nature of the arbitration agreement here creates separate proceedings and supports a stay, but that does not mean it creates a blanket rule requiring bifurcated MFIL litigation.

Relatedly, the Jamils argue that this action should not be stayed because the arbitration would not have a preclusive effect on the litigation. (ECF No. 19, PageID.915–916.) This is partially true—arbitration proceedings, especially if not later reviewed by a court, generally do not have a preclusive effect on claims not subject to the arbitration. *W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 765 F.3d 625, 630 (6th Cir. 2014). An arbitrator has no authority to decide claims that the parties have not mutually agreed to arbitrate, and "[i]t makes little sense to allow an arbitration proceeding or award to preclude a claim the arbitrator had no authority to decide." *Id.* at 631. A contrary approach "would force a party, through the doctrine of res judicata, either to arbitrate a claim it had not agreed to arbitrate, or to effectively give up the claim." *Id.* But this same rationale does not apply to issue preclusion. *See W.J. O'Neil Co. v. Shepley, Bulfinch, Richardson & Abbott, Inc.*, 700 F. App'x 484, 489 (6th Cir. 2017) ("[O]ur prior panel opinion stated that claim preclusion was not appropriate because otherwise a party would be forced 'either to arbitrate a claim it had not agreed to arbitrate, or to effectively give up the claim.' *W.J. O'Neil Co.*, 765 F.3d at 631. Such a consideration does not extend to matters of issue preclusion because collateral estoppel bars the re-litigation of issues, regardless

10

of the legal claims."); *see also Kentucky Petroleum Operating Ltd. v. Golden*, No. 12-164, 2014 WL 222010, at *4–5 (E.D. Ky. Jan. 21, 2014) (finding issue preclusion, but not claim preclusion, where the defendants were not a party to a previous arbitration that resolved a question relevant to the lawsuit). So even if no *claims* are precluded by the arbitration, some *issues* may be. Indeed, issue preclusion is precisely what is contemplated by the consideration that nonarbitrable claims can be stayed where "the arbitration may resolve issues in the lawsuit." *Thomas*, 2015 WL 4078173, at *8 (citing *Sierra*, 937 F.2d at 750).

In addition, a stay is warranted here because the discovery obtained during the arbitration proceedings will conserve judicial and litigant resources and greatly aid the Court's ability to decide several of the key issues here. The Jamils' complaint currently contains broad generalizations and group pleading about what "the Defendants" did, collectively. (*See generally* ECF No. 1.) This group pleading does not enable the Court to determine whether it has personal jurisdiction over each of the non-resident Defendants, nor the specific misstatements and representations supporting the Jamils' claims of fraud against each Defendant individually. The moving Defendants argue this is a reason to dismiss the claims. But that seems an inefficient course of action where these issues are curable through amendment. *See, e.g.*, *Fisher v. Roberts*, 125 F.3d 974, 977–978 (6th Cir. 1997) ("We have recognized that it is necessary to permit the liberal amendment of complaints in order to adhere to the principle that cases should be tried on their merits rather than on the technicalities of pleading." (internal quotation omitted)). And additional discovery

11

from the arbitration would aid the Jamils in preparing an amended complaint that addresses these issues.

Start with the jurisdictional issues. "The fact that a corporation does business in Michigan, without more, is insufficient for a court to assert personal jurisdiction over the directors and officers of that corporation." *See SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 354 (6th Cir. 2014). The individual officer must be "actively and personally involved in the conduct giving rise to the claim." *Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 698 (6th Cir. 2000). For each of the non-resident Defendants, the Jamils "cannot rely solely on their role as executive officers" of SFGI or their names being listed as franchise sellers in SFGI's documents to establish personal jurisdiction; they must plead each Defendant's "specific actions giving rise to [these] claims that meet the standard for purposeful availment." *Functional Hiit Fitness, LLC v. F45 Training Inc.*, No. 22-10168, 2023 WL 6367691, at *20 (E.D. Mich. Sep. 28, 2023).

The complaint as it currently stands is light on the specific acts that each Defendant took that would support the Court's exercise of personal jurisdiction over them. For example, the complaint does not specify which individuals prepared the Franchise Disclosure Document or the brochure that allegedly contains fraudulent representations, whether those documents were prepared in Michigan, whether they communicated with the Jamils in Michigan, where the funds that were allegedly embezzled/converted were being held (for instance, if they were held in Michigan bank accounts), or where the funds were allegedly moved to or spent. The Jamils even

12

acknowledge that jurisdictional discovery may be necessary. (ECF No. 19, PageID.923–924.) The discovery obtained in the arbitration would likely eliminate, or at least reduce, the need for any jurisdictional discovery in this litigation or allow the Jamils supplement the allegations in the complaint, after the arbitration concludes. And if supplemental jurisdictional discovery is needed after the arbitration, the Jamils can better articulate what further discovery is needed at that time.

Similarly, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet the heightened pleading standards for fraud, plaintiffs must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Llewellyn-Jones v. Metro Property Group, LLC*, 22 F. Supp. 3d 760, 780 (E.D. Mich. 2014) (quoting *Indiana State Dist. Counsil of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir. 2009)). A plaintiff cannot meet this heightened pleading requirement by "indiscriminately grouping all of the individual defendants into one wrongdoing monolith." *Id*. (quoting *United States, ex rel. Branhan v. Mercy Health Sys. of SW. Ohio*, 188 F.3d 510 (6th Cir.1999) (Clay, J., concurring in part and dissenting in part)).

While the Jamils do identify specific representations that they claim were fraudulent, they attribute these statements to SFGI (a non-party) and Rhino7 (a non-movant). (ECF No. 1, PageID.9.) The Jamils present almost no allegations of specific

13

misrepresentations that the moving Defendants made.[2] But they do allege that the Defendants "made their misrepresentations as a group" and should be held liable because they "controlled SFG[I]" and "knowingly exploit the contract that SFG[I] has with its franchisees." (ECF No. 19, PageID.923.) Therefore, the fraud claims against the Defendants here are inextricably intertwined with the fraud claims against SFGI in the arbitration. Allowing the fraud claims against SFGI to be resolved in the further-along arbitration will create efficiencies in this case, including with discovery.

Lastly, the Jamils would suffer little prejudice from the delay. Unlike in *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, the main case on which the Jamils rely in their argument opposing the stay, the Court's stay does not operate as an effective dismissal. 460 U.S. at 4. In *Moses*, the Supreme Court found that the district court had improperly stayed a case on abstention grounds under the *Colorado River* test, in part because the stay effectively operated as a dismissal: The state court case supporting the abstention would resolve the claims in a preclusive judgment, leaving nothing for the federal court to adjudicate once it was over. *Id.* at 28 (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)). As discussed, that is not the case here. Once the arbitration against SFGI concludes, the

---

[2] The Jamils do allege that Kevin and Chris "promised the Jamils they would be millionaires" during a Zoom call. (*Id.* at PageID.11.) But as defendants point out, this is a "non-actionable statement[] of future opinion and puffery." (ECF No. 15, PageID.505 (citing *Van Tassel v. McDonald Corp.*, 407 N.W.2d 6, 9 (Mich. Ct. App. 1987)); *see also Cent. On Line Data Sys., Inc. v. Filenet Corp.*, 99 F.3d 1138 (Table), 1996 WL 483031, at *5 (6th Cir. Aug. 23, 1996) (explaining that under Michigan law, "future promises" and "mere opinion or puffing" "cannot give rise to a claim for fraud.").

Jamils will be able to return to this Court to litigate their claims against these other Defendants. True, there will be some delay. But arguably, the delay will help, not hurt, the Jamils. Again, it will aide them in adequately pleading personal jurisdiction over several Defendants and fraud claims against several others. So they will suffer little prejudice from the stay.

## III.

For the foregoing reasons, the Court GRANTS the moving Defendants' motion for a stay (ECF No. 15) and STAYS the case pending the resolution of the arbitration against Spray Foam Genie International, LLC. The Court also DENIES the motion to dismiss (ECF No. 15) WITHOUT PREJUDUICE to refiling after the stay is lifted.

SO ORDERED.

Dated: August 21, 2025

s/Laurie J. Michelson
LAURIE J. MICHELSON
United States District Judge
